Stephen Rosenthal is here for the appellant. John O'Quinn is here for the appellees. And Mr. Rosenthal, you may begin when you're ready. Thank you, Your Honors. Good morning. Stephen Rosenthal along with Christina Martinez on behalf of the appellant, Mr. Olhausen. It's nice to actually see all of you. I'd like to begin with a couple of questions. First, do the allegations in the complaint satisfy the presentment requirement of Section 3729A1A? And second, whether or not Subsection A1B contains a submission requirement that the parties contest? And that we urge the court in its discretion to consider. With respect to the complicated array of Medicaid regulations, Medicare regulations, we'd like to rely on our briefs for the elements that both parties agree are not squarely presented, not necessarily decided by this court, which the court didn't decide, falsity, scienter, immateriality. So try to rely on my briefs on that if I may. Moving to the first issue, there's a very narrow focus, I think, before the court on the question of whether we have satisfied the presentment element of Subsection A1A. That, of course, is the ground on which we were dismissed by Judge Scola. But Judge Scola did not consider the allegations of the audits, the internal audits that Arriva Medical had performed of its own claim submissions. Can I stop you there? I'm sorry to interrupt, but the audits related to the assignments of benefits, is that right? Yes. The audits related to the assignment of benefits and we have argued, as is alleged in the complaint, that they also involve the Philippines operation. So that's the bridge to Count 4. But I do think, if I'm implying from your question, it's important for the court to look at them as far as how they apply to Count 2, separately from Count 4. Right. And I'm prepared to acknowledge and discuss that. But I think it's most important for us as appellants to first just articulate why, specifically with respect to Count 2, the assignment of benefits issue, where the claims were submitted with the box checked saying they had an assignment of benefits on hand from the beneficiary, were false. That's the allegation. And why those claims themselves, as evidenced by the audit allegations, suffice to meet our burden of showing with particularity that claims were actually presented to the federal government. Are there any specific claims mentioned in the audit? There, oh, well, I can only speak to what's in the complaint, Your Honor. The complaint does not identify specific claims per individuals. So the answer would be no. What it does do . . . An audit wouldn't contain that, though, would it? It wouldn't contain a claim presented to the government. This is the claim on a specific date. It wouldn't have that in an audit. Well, actually, there are other allegations in the complaint that are part of the counts that are not on appeal, in the odd numbers complaints, where you will see that there are actually specific, claim specific, individual numbers of Medicare beneficiaries that are in those audits. Different audits. The allegations as to the particular audits that we're focused on do not have that kind of particularity. And so I want to step back for a second and address the standard that the court has to utilize that its precedent says. The complaint has to give some indicia of reliability to support the allegation of an actual false claim for payment being made to the government. That's the Claussen case, the leading case in this space in the Eleventh Circuit. So subsequent decisions in this court have said that the purpose is to show the basis of the allegation of submission. That's the particularity the Claussen case and the unpublished Mastedge decision helpfully explains that precedent. Yeah, well, you're ignoring Carroll versus AIDS Healthcare where we said that generalized statistics about potential false claims are not enough to meet the particularity requirement of Rule 9. Right, and in Carroll or Correll, that case, the relator used statistics and said therefore that gives rise to an inference that claims must have been submitted to the government and this court rejected that. We're not trying to do that. What we're saying, Your Honor, is that paragraphs 134, 135, and 136 of the complaint say claims were submitted to the government. We're not relying upon an inference and the basis for that allegation is that there were internal audits that documented that. But there are no, but in any event, we don't have examples or the complaint doesn't allege that there are examples of specific claims that were presented. Absolutely correct, and this court's precedent has said that it's not a prerequisite to have specific examples. What the court must search for is indicia, some indicia of reliability of the assertion of presentment and so . . . It seems to me all he's alleging is that he participated in weekly meetings with employees who were reporting to him about the fraud. Well, no, Your Honor. That plus there are internal ARIVA audits that show that certain percentages of claims were submitted without AOB, with AOB designations where they didn't have the AOB on file like they should have for specific quarters of particular years. If we look at the complaint, would we come away with the claim that Olhausen ever saw one himself? You mean a form itself? Yeah, a claim that was presented for payment. I don't . . . With respect to this count, count two, I think the answer is it would be inconclusive. What I think the court cannot ignore is the fact that Mr. Olhausen clearly saw audits, internal audits, which summarized the fact that many false claims were submitted. Because think about what we're talking about with an audit. We're talking about something that's effectively a summary from . . . I'm thinking in terms of Federal Rules of Evidence. It's a summary or it's an admission of a party opponent effectively. If you're looking at indicia of reliability, an audit should be on a different level than something like a complaint that says, I had a conversation with somebody in the billing department. Well, let me ask you about that though. Haven't you though backtracked or abandoned your position that you had in front of the district court that because he was a corporate insider, it gives your complaint the indicia of reliability needed to pass muster under Rule 9b? Haven't you abandoned that position? We are, I would say, partially. We are not relying upon, I am not relying on appeal on that generic gestalt insider exception that the court has recognized. What I'm saying is that we have hard and fast allegations that should be credited of actual submission. They are bolstered by his position because, as Judge Wilson said, he was privy to conversations. He was actually the one, as alleged, who instigated conversations at the company about this problem. I was just asking the question now. Would an internal audit list each specific false claim or does somebody have to go through the audit and pick them out? I think what you're getting to really is a question of factual specificity that arises at the discovery phase. I would point the court, and I have to emphasize it, we did in our brief, to the D.C. Circuit's opinion. It's the only case I could find, good or bad, where 9b specificity for purposes of presentment of a claim was satisfied by an audit, an allegation in the complaint about an audit. The allegation in that case was, frankly, less specific than the allegations Mr. Olhausen has made based upon the audits that he is referring to. It was a generic statement, and this is the Heath versus AT&T case in the D.C. Circuit, where the court said that reliable indicia, the audit allegation, supplied reliable indicia that lead to a strong inference that claims were actually submitted because the precise details of individual claims are not an indispensable requirement of a False Claims Act complaint where there's a concrete example as presented in the audit. We have three specific audit allegations that are undeniably particularized. They do not have, Judge Wilson, the particular individual claim, but that shouldn't be and is not the test in this court. Can I turn your attention to Count 4 for just a moment? I think maybe you were going to get to this and explain how the audit addresses the content of that. There are two points I'd like to make about Count 4. I do think that Count 2 is the stronger bottomed claim based upon those audit allegations. However, they also support Count 4 in two different ways. First, in paragraph 144 of the complaint, the allegation is that the audit allegations relate to the Philippines operation, which is where the vast majority of the business was being conducted as alleged in the complaint. Now, we concede because our opponents correctly say, well, you're relying upon some math there, aren't you? And this court has said, as Judge Wilson emphasized, you can't use mathematical probability to give rise to an inference of submission. So we concede that we are starting on a rock in the stream, which is a solid rock, which is that there are audits that show that claims were submitted, many claims, and a large percentage of them lack the AOB issue. The question is, where do those claims come from? Did they implicate the Philippines operation? And so in that respect, we do have to rely upon math, but it's a secondary rock in the stream. The second point I'd make is independent of math altogether, which is that don't forget that Count 4 also pleads a fraud in the inducement theory. And that fraud in the inducement theory says the original contract applications in 2013 and 2016 submitted to the federal government, and those allegations are clear that they were submitted, contained misrepresentations about the non-existence of the Philippines operation, use of it, whether as a location or an unauthorized subcontractor, depending upon which way it turns out to be proven. As a result of that, it's clear that those false statements, at least under an A1B theory, were received, were submitted to the federal government. Why? Because the government ultimately issued those contracts based upon those contract applications. So that's rock-solid, and so at a bare minimum for fraud in the inducement, every single claim that was submitted as documented by the audits was in furtherance of the original fraud in the indictment. So the complaint ought to, at the very least, have a copy of the false claim that was presented? Well, Your Honor, that would be ideal, but that is not what this Court has insisted upon. And with the very little time I have left, I've reserved several minutes, I at least want to touch on the A1B point so that I have an opportunity to address it in rebuttal. I can say briefly that the sum and substance of the text in the Supreme Court's 2009 FERA amendment to subsection, what became A1B, left no indication that submission of a false statement to the government is an element. And then this Court's precedent, as we briefed in FALP and then very recently in Yates, tells district courts and litigants that there are three elements. And the only place that claim comes in is material to a false claim, but it's never listed as a material to a false claim. Does the material to a false claim force the plaintiff to plead submission with particularity, or is it sufficient for the plaintiff, the relator, to plead materiality with particularity? And I think I'd like to reserve my time to address that further, depending upon the Court's questions, if I may. Thank you, counsel, and we'll hear from Mr. O'Quinn. Thank you, Judge Wilson, and may it please the Court, John O'Quinn, on behalf of the defendants. Judge Scola, properly dismiss the third amended complaint and the counts at issue on appeal based on relator's failure to plead the submission of any false claims with particularity. Let me ask you a question about that. With respect to count two, and just count two, the audit, the first two things that the audit says, we don't know what the items that were ordered were for which there was a problem with the AOBs. But for the third one, it says, for the third quarter of 2015, the consultants found that on average, ARIVA had an AOB on file for the beneficiary for only 53% of heating pads ARIVA shipped to its beneficiaries and billed to Medicare. Let me ask you first, am I understanding correctly that an AOB is required to be on file with respect to heating pads? I understand that you get down to the Santa thing, but just for presentment issue purposes. Sure. No, I appreciate the question, Judge Rosenbaum. That is a point of disagreement between the parties, whether or not as a participating provider, ARIVA would have had to actually affirmatively get an AOB, an authorization of benefits, from a beneficiary. And if you look at, for example . . . For heating pads. For heating pads. Because if you look, for example, at 42 CFR 424.55C, it specifically says that if you're a participating provider, that you don't have to get an authorization of benefits. And that gets to the scienter element. Let me ask it to you this way, maybe a better way to ask the question. Assume for purposes of this hypothetical, that an AOB is required for all heating pads. If an AOB is required for all heating pads, why isn't the allegation from the audit that 53% of heating pads ARIVA shipped to its beneficiaries and billed to show a claim was submitted or presented? Sure. So Judge Rosenbaum, at page 55 of the opening brief, the relator makes clear that the theory on count two, and we're talking about count two here, the theory on count two is a theory of affirmative misrepresentations. That ARIVA, quote, affirmatively misrepresented by making a checkbox that it had an AOB on file with respect to claim forms. That allegation is not pled with any particularity and it is not supported by paragraph 136, which is the paragraph that you were asking about. Because paragraph 136 and not any one of the allegations about the so-called audits or audit allegations say that claims were submitted with the box checked. They say that the claims were submitted without an AOB, but not with the affirmative misrepresentation that claims were submitted with the box checked. And that's critical to his allegations at paragraphs 130, 132, 138, 145, and 375 with respect to count two. Affirmatively alleging that there was a box, there was an affirmative misrepresentation to the government that an AOB was on file when in fact was not. And the audit allegations don't say anything about that. At most they stand for the proposition that you submitted at least with respect to paragraph 136. At most it stands for the proposition that a claim was submitted without an AOB, but not that there was a misrepresentation. And you don't have to agree with the argument that we're making with respect to 42 CFR 424.55C. That just is an example. So is 42 CFR 424.36E in which it says that you can accept other claims. That's an example that shows that it is not permissible to infer as night follows day that just because you submitted a claim without an AOB means that you necessarily checked a box that showed that an AOB was submitted. And in fact, this is where you run into the real deficiency in the pleadings here. Because as Judge Scola recognized, there are generally two ways that this court recognizes to meet the 9B requirement for the pleading of submission. One is, as you were asking about Judge Wilson, is do you have the actual details of a single claim? Do you have a single example of a claim that has been submitted without the box being checked? And they don't. They candidly admit that they don't and that they're not relying on that. And they say that candidly at page 45 of their brief. Let me ask you something. Does this court need to address the issue of whether claim submission is necessary under subsection A1B? I don't think the district court really had the opportunity to rule on that. Judge Covington, I think that issue has been forfeited. Just like I think that their arguments, their factual arguments about relying on the audit allegations with respect to count four, I think those are also forfeited. But the specific A1B issue, they concede that they make is that it could be a miscarriage of justice. They don't really attempt to satisfy that standard. And candidly, I don't see how they possibly could. Because these are not their claims. These are the government's claims. The government investigated these claims. The government had no compunction about intervening when it wanted to, and it did in the Goodman case. The government did not intervene here. But they're not their claims. So they can't possibly, I think, satisfy the miscarriage of justice standard. And there's no reason to excuse their forfeiture, even though it would be a pure legal issue of interpretation. And there's no basis for excusing their forfeiture, which I think is a factual issue with respect to making arguments about the audit allegations applying to count four. So turning back, Judge Rosenbaum, to the question that you had previously asked, at the end of the day, the audit allegations just simply won't bear the weight that they're putting on them. And it is for two reasons. It's the reason that I just described a moment ago, which is that they don't connect the dots. The audit allegations do not say and do not provide any indicia of reliability, much less a particularized example, that a claim was submitted with the box checked. Was there, in entering the contract in the first place, was there an affirmative representation that assignments of benefits would be on file in all cases where it was necessary for them to be on file? Judge Rosenbaum, I'm not aware of that. It's certainly not something that the relator has made a suggestion of. So I'm not aware of that being the case. And to the extent that the relator is trying to essentially resuscitate its claim of fraud in the inducement with respect to Count 4, and I don't know that they ever made a fraud in the inducement claim with respect to Count 2, but with respect to Count 4, which had to do with the locations, and the audits, in addition to them not having made this argument in front of Judge Scola with respect to Count 4, the audit allegations being relevant to that, not only did they not do it, frankly, they didn't do it with good reason. Because the audit allegations don't tell you anything about the location that they were submitted from. There are no allegations that relate to the audits that have anything to do with the location from which claims were submitted. And that actually goes to, I think, what is really one of the fundamental problems with the audit allegations themselves, which is they don't tell you who did the audits, they don't tell you what they audited, they don't tell you how many claims were audited, they don't tell you anything about the sample, the sample size, where it was from, they don't give you any particularities about the data sample, they don't tell you who specifically requested the alleged audit, they don't even tell you who the alleged audits were provided to. And companies, of course, do audits all the time to control for best practices or for any other reason, and so if a party can come into court and just simply allege, well, there's an audit, and that that provides enough to get past what 9B requires, then I think it would essentially gut the application of 9B, certainly as this court's articulated in a trilogy of cases like Claussen, Corsello, and Carroll. And I think the same is true with respect to the fraud and the inducement argument that counsel suggested, but didn't really develop, with respect to Count 4. And you're not talking about an allegation here of sort of what I would call a classic fraud and the inducement, where there's like a complete misrepresentation at the time the parties enter into an agreement. So, for example, classic case of this would be, you know, if somebody enters into an agreement with the government and they falsely represent that they are a minority-owned business. Well, the fraud is complete at that point. But here the allegations that they're making with respect to Count 4 depend on there in fact being false claims submitted from these other locations. And as I think counsel sort of candidly admitted, for that, the only thing that they're ultimately relying on in bootstrapping the audits is a probabilistic type of argument, the kind that this court has rejected in any number of cases that, you know, just because you say that there were a large, you know, a large part of your business was with the government, that is not sufficient to satisfy the requirements of 9b. If the court has further questions about the audit allegations in particular, about the issues with respect to the failure to plead particularity as to either count, I'm happy to address those and I'm of course happy to address questions relating to the issues under . . . I'm trying to remember the case, but former Judge Barquette has suggested before in a dissent, maybe it was the Clawson case, that maybe we're asking too much of these later relators. A lot of this information is, you know, might be available and, you know, we can find these false claims as a result of discovery. Here we've got a senior vice president of the company here who's aware, he says, of the submission of these false claims and we've kind of allowed some leeway have we before when the relator has firsthand knowledge of the fraud. We did that in Walker versus R&F Properties. That's right, Judge Wilson, and you did it in Hill, you did it in Matheny as well and actually it comes back to an earlier point that I started but I didn't quite finish which is I think this Court has generally recognized there are two ways to satisfy the 9B requirement. One is if you've got a particular specific exemplar, if you've got specific details about actual claims that were submitted. The second is, as you were alluding to, Judge Wilson, is that if you have an insider who actually pleads with facts, not just conclusory assertions, but pleads facts that show that they were privy to the submission of claims. And respectfully, I think this case, yes, he was a vice president for business development and marketing. Does he have any allegations that he knows anything about what is actually being submitted? Answer, no. He doesn't. He doesn't have . . . Well, he's upstairs on the fifth floor. He's not downstairs in the mail room sending out emails. He doesn't have access to the forums themselves, but he knows what's going on down there. Respectfully, Judge Wilson, there's not a single allegation to that effect. He doesn't allege that he supervises anybody in the billing department or that he supervises anybody who was responsible with submissions. I think that what he does allege here . . . He alleges that the employees are reporting to him about the fraud. No, actually, I don't think that's quite so, Judge Wilson. I think he does allege that he was aware of what was, for example, in the scripts, whether or not they would ask for an assignment of benefits, but he doesn't allege any firsthand knowledge about the so-called checking of the box or of the affirmative misrepresentations that he relies on. And he doesn't allege any knowledge about submissions from other locations. And I think this case ends up looking just like Atkins, Corsello, and Carroll, where you had relators who worked for the company. You had relators who even had a high-level position within the company, and they knew a lot of details about certain financial things, but none of them had any knowledge or firsthand experience, or at least they hadn't alleged it with respect to billing. And if you look at what he does allege, it doesn't look like anything that was alleged in Hill or in Mastage. In Mastage, they reviewed every patient at a weekly meeting, and the falsity came from the fact that the patients categorically should not have been submitted. And it doesn't look like Walker v. R&F that you were making reference to, Judge Wilson, because there the employee was actually involved in the billing conduct. Instead, his allegations with respect to submissions of quote-unquote checking the box, you look at paragraphs 138 and 145, there's no particularities provided. And those are the two paragraphs in which he refers to checking the box. The same is true of saying that they had AOBs when they allegedly, in fact, did not. And the same is true with respect to Count 4. One of the arguments that he makes is that this was more than just a request for payment, that it also contained representations about where the goods and services were provided. And if you look at paragraphs 279 and 297, those paragraphs about services being provided from locations other than Florida, but representing that they were from Florida, there's nothing particularized about any of them. What does he rely on? He doesn't even purport to rely on his own insider knowledge. If you look at paragraph 300, what he relies on is quote, information and belief. And indeed, many of the allegations in the complaint with respect to both of these counts turn on information and belief, which this court has consistently held is not sufficient. I'm happy to answer any additional questions the court may have, but see that I've otherwise used up the balance of my time. All right. Thank you, Mr. O'Quinn. Thank you, Judge Wilson. And Mr. Rosenthal, you've reserved some time for rebuttal. I'd like to address primarily this assignment of benefits, check the box point that Mr. O'Quinn raised. If the court looks at paragraphs 130 through 140 of the complaint, it will see that there are direct allegations that ARIVA did not, they did check the box. They checked the authorization on file box when they submitted claims to Medicare. Now, his particular complaint is that that detail of the box being checked is not actually in the few paragraphs related to the audits. I submit to the court that it is, but it's Sorry, I'll back up to 132. ARIVA knew it did not have signed AOBs for large numbers of beneficiaries yet represented to CMS that it had a signed AOB on file for every claim submitted to CMS. ARIVA knew, paragraph 133, it did not have signed AOBs because it regularly conducted internal audits and hired an outside consulting firm to conduct audits of its claims to CMS. That's the preface to the three allegations related to the actual audit findings. And the audit findings say things like, to use the one that Judge Rosenbaum pointed to because it is the most particularized, paragraph 136, for the third quarter of 2015, the consultants found that on average, ARIVA had an AOB on file for the beneficiary for only 53% of the heating pads ARIVA shipped to its beneficiaries and billed to Medicare. The whole point of the audit is that it's showing the company that notwithstanding its representation, which it had an AOB on file, had an authorization on file, only 53% of them did. That's the whole point of an audit. It's showing the company that there's some discrepancy. So the idea that the allegation itself doesn't say, and the box, the audit says the box was checked, is insisting upon the kind of detail that is frankly the point of absurdity. Judge Barquette's dissent in the Claussen case, I'm glad the court invoked because I clerked for Judge Barquette and I know she was in that position many times. I was before that case was decided, but the majority's response to that was to say, look, we're not saying you have to have every single detail. You have to have some indicia of reliability. This is strong indicia of reliability, these audits. Again, I urge the court, if it hasn't, to read the Heath D.C. Circuit case because it is the one court of appeals that has looked at this very specific question and said, an audit really can supply that indicium of reliability. I would answer Judge Rosenbaum's question about whether there's any provision in the contracts that spoke about the particularity of having AOBs and making those representations. I don't believe that contracts are that specific. Paragraph 236 references a contract where it says that you agree to comply with all applicable federal laws. That's the degree of specificity that it gets to for this kind of thing. It's wrapped into that. The other thing Mr. O'Quinn alluded to is the dispute that we have on these other subsidiary issues about whether or not they did or didn't have to have an AOB on file. Our argument's in the brief on that. We think, I mean, Judge Scola didn't address that. There's a robust debate on that. The bottom line is our view has pled in paragraphs 120 to 122 of the complaint. Because these particular products were not part of the DMEPOS contract, competitive bidding contract, even though ARIVA was selling them and seeking reimbursement from Medicare for them, because they weren't part of that program, they didn't get to benefit from the billing on an assignment-related basis program. They had to have the AOB on file for those people. Under Scienter, don't we have to, I mean, doesn't it have to be clear that this was an obligation on the part of the company? It does. It does. At the same time, they can't stick their heads in the sand. I agree. What is the authoritative source that you would rely on to say that it was clear? Let me see if I can find that for you, Judge, real quick. Thank you. There's a Medicare processing manual that says that at the bottom line, you must still obtain signed authorizations from beneficiaries for each claim. The defendants were aware of this requirement. I point you to paragraphs 25 to 26, 119, 376 to 377. There are allegations about Scienter at, and I know I'm not specifically giving you anything more particular, 123 through 129 and 373 to 377. It's in our initial brief at pages 52 to 53. The argument is essentially that they did know, and based upon Medicare's own practices, that if you're not within the program, if you're selling products that are not within the program, your competitive bidding contract, you have to have the assignment of benefits on file. With that, given that my time's elapsed, I would just say we would urge the court to reverse and allow the even-numbered counts to survive for another day. All right. Thank you, Counsel. Mr. Rosenthal and Mr. O'Quinn. By the way, Mr. Rosenthal, I hope your high school classmate is confirmed by the Senate. All right. Well, that completes our docket for the week, and court is adjourned.